2009 VT 72

## In re M.S.D.D., INC. d/b/a Spanked Puppy Pub

[980 A.2d 777]

No. 08-352

¶ 1. July 15, 2009. Licensee appeals the Liquor Control Board's decision to suspend the establishment's liquor license for twenty-five days based upon the Board's finding that licensee violated a regulation concerning the serving of alcohol to intoxicated patrons. We affirm.

¶ 2. During the wee hours of the morning on November 17, 2007, after consuming alcohol at licensee's establishment, a patron drove his car the wrong way onto the interstate highway and struck another vehicle head-on, resulting in a fatality. Following an investigation, the Department of Liquor Control alleged in a notice of hearing that licensee had violated two regulations concerning the fur-

nishing of alcohol to patrons. The Board held a contested hearing, during which several persons testified on behalf of and against licensee. Following the hearing, the Board determined that licensee had not violated General Regulation 17 (GR17), which prohibits furnishing alcohol "to a person displaying signs of intoxication," but that licensee had violated General Regulation 17a (GR17a), which prohibits serving alcohol "to a person whom it would be reasonable to expect would be under the influence as a result of the amount of alcohol served to that person." Department of Liquor Control Regulations 17 & 17a, 4 Code of Vt. Rules 26 020 016-1 (2005).[1] Licensee obtained a stay of the resulting twenty-five-day suspension pending this appeal.

¶ 3. Licensee first argues that the Board erred by allowing a state trooper to testify regarding statements that the patron made to him shortly after the accident. According to licensee, the Board's admission of the hearsay testimony under the excited-utterance exception was erroneous, given (1) the lack of foundation evidence establishing that the patron was under the stress of excitement, and (2) the Board's own findings indicating that the patron was reflective and guarded in responding to the trooper's questions. Absent the patron's statements to the trooper, licensee argues, there is insufficient evidence to conclude that it violated GR17a. Generally, "[t]he rules of evidence as applied in civil cases in the superior courts of this state shall be followed" in administrative proceedings. 3 V.S.A. § 810(1). However, "[w]hen necessary to ascertain facts not reasonably susceptible of proof under those rules, evidence not admissible thereunder may

be admitted . . . if it is of a type commonly relied upon by reasonably prudent [persons] in the conduct of their affairs." *Id.* Moreover, "[e]rror may not be predicated upon a ruling which admits . . . evidence unless a substantial right of the party is affected, and . . . a timely objection or motion to strike appears of record, stating the specific ground of objection." V.R.E. 103(a)(1).

¶ 4. From the briefing, it appears that the evidence licensee finds objectionable is the patron's statements, recorded on a video in the trooper's vehicle. These include the patron saying that he had eight to nine drinks during the day and night, only a small number of which were consumed during the day. These statements did not come out through the testimony of the trooper, to which licensee made a hearsay objection.[2] Indeed, virtually all of the testimony of the trooper related to his observations of the patron's actions and state of intoxication, and not to the patron's statements.

¶ 5. The patron's statements at issue were made during the video-recorded interview, which the State offered as evidence and the Board admitted. The only objection licensee made to the admission of the video was that the patron had not been given his *Miranda* warnings, an objection it does not pursue in this Court. In the absence of a hearsay objection to the admission of the video to the Board, its hearsay argument here is unpreserved. See *State v. Lettieri*, 149 Vt. 340, 344, 543 A.2d 683, 685 (1988) (objection on the wrong ground precludes a party from raising a new ground on appeal). The statement was properly admitted.

---

[1] General Regulations 17 and 17a have been recodified as General Regulation 18 and 18a. Department of Liquor Control General Regulation 18 & 18a, 4 Code of Vermont Rules 26 020 016-1 (2009).

[2] The only statements the trooper testified to were that the patron stated that he was in an accident and that he left the scene to find a pay phone. This evidence is largely irrelevant to the issues before the Board. In any event, it is covered in more detail in the video.

¶ 6. Licensee next asserts that, even with the admission of the trooper's testimony and the videotape, the Board's findings of fact do not support its conclusion that licensee violated GR17a. For the most part, licensee's arguments on this point completely miss the mark in the sense that they appear to be directed at GR17, of which the Board found no violation, rather than GR17a. Licensee asserts that it may serve drinks to anyone who does not "appear to be" under the influence, and that no evidence or findings demonstrated that the patron "appeared under the influence" when he was served alcohol at its establishment. Licensee notes that the patron did not display any signs of intoxication when he first entered the establishment, and that none of licensee's employees observed any indication of intoxication during the approximately three hours that he was on the premises. Licensee reiterates that there were "no observable signs" of intoxication at any point during the evening, and that in fact not a single person reported that "they observed signs of intoxication" from the patron. According to licensee, there can be no violation of GR17a unless the patron's intoxication is "observable to the one selling the alcohol." Licensee asserts that the Board erred in finding a violation of GR17a because its own findings demonstrate that the patron "displayed no outward signs of intoxication."

¶ 7. These arguments are entirely unavailing. The Board explicitly declined to find a violation of GR17, which prohibits furnishing alcohol to persons "displaying signs of intoxication." Instead, the Board found a violation of GR17a, which prohibits selling alcohol "to a person whom it would be reasonable to expect would be under the influence as a result of the amount of alcohol served to that person." Here, based on the patron's statements on the video and the undisputed evidence concerning his blood-alcohol concentration (BAC) after the accident and at various times earlier during the evening, the Board rejected as not credible the testimony of licensee's employees concerning the number of drinks served to the patron during the three hours or so he was at the establishment. As the Board found, the undisputed evidence indicated that the patron's BAC was .202 at 2:20 in the morning of November 17, which would have made it .226 at 10:45 the previous evening, about halfway through the patron's stay at the establishment, and .211 shortly before the patron left the premises and drove the wrong way on the interstate. Based on this evidence, the Board determined that the patron "consumed far more alcohol than [licensee] proclaimed that he did," and that "materially all of the high BAC that [the patron] obtained was acquired while he was at [licensee's] premises." According to the Board, "[w]hoever and however [the patron] was served the multiple alcoholic drinks while at [licensee's establishment] to achieve the very high BAC level discussed, [it] violated [GR17a] on apparently more than one occasion."

¶ 8. The Board acknowledged the possibility, however remote, that the patron may have been given drinks by other patrons, and thus that licensee's employees may not necessarily have served the patron all of the drinks that led to his high BAC. Nevertheless, the Board found a violation of GR17a, given the patron's history of having arrived at the establishment intoxicated, thereby creating a heightened duty on the part of licensee's employees to assure that the patron was not obtaining alcohol from other patrons. We conclude that the Board did not exceed its authority in finding a violation of GR17a under these circumstances. See *In re Kacey's, Inc.*, 2005 VT 51, ¶ 5, 178 Vt. 567, 879 A.2d 450 (mem.) ("[A]bsent compelling indication of error, we will uphold the Board's interpretation of the administrative regulations and statutes within its purview."); *In re Capital Inv, Inc.*, 150

Vt. 478, 480, 554 A.2d 662, 664 (1988) ("In reviewing an administrative agency's determination, we presume the reasonableness and validity of a determination made within the agency's expertise, and require a clear and convincing showing to overcome the presumption.").

¶ 9. The dissent postulates three possibilities for how the patron may have become intoxicated and contends that only the first possibility — that the licensee directly served him more drinks than its employees claimed — can constitute a violation of GR17a. According to the dissent, the other possibilities — that the patron received drinks from other patrons, or that the patron drank most of the alcohol before arriving at licensee's establishment — are just as plausible as the first possibility. This reasoning does not persuade us to overturn the Board's decision. Regarding the third possibility, as the dissent acknowledges, the chemist testified that most alcohol ingested by the patron before he arrived at the bar would have been eliminated from his blood during the lengthy period between the time the patron arrived at the bar and was involved in the accident. In any event, the patron himself stated in the video that he had consumed little of the alcohol during the day. Thus, the dissent would reject the Board's findings and decision based on a scenario denied by the patron at trial and not raised by licensee on appeal. We decline to do so.

¶ 10. Regarding the second possibility, the dissent proposes that the multiple extra drinks that the patron necessarily consumed at the establishment beyond what licensee's employees claimed they served to the patron were all supplied by other patrons of the bar. Putting aside the obvious unlikelihood of such a scenario, the Board specifically found incredible the testimony of licensee's employees as to how much alcohol they served the patron. In any event, we do not believe that GR17a requires the State to prove

that a licensee's employees served the drinks directly, as opposed to through other patrons, to a particular patron — particularly, as here, when the patron had a history of intoxication at the establishment. We decline to impose an unworkable standard under which the State would have the impossible burden of proving that a patron did not obtain drinks imbibed at an establishment from other patrons. In our view, it is the licensee's obligation to monitor "the amount of alcohol served to that person," GR17a, however the alcohol is physically delivered to that person. In short, undisputed evidence in the record supports the Board's conclusion that licensee allowed the patron to consume an excessive amount of alcohol at its establishment, in violation of GR17a. Given this resolution, we reject licensee's brief final argument that the Board erred by not granting its motion to dismiss the Department's allegations.

*Affirmed.*

¶ 11. **Skoglund, J.,** dissenting. The tragic fatality underlying this regulatory enforcement proceeding provides tempting grounds to overlook the serious evidentiary and legal flaws in the State's case. That is not a luxury afforded to courts of law, however, and therefore I am bound to dissent. Contrary to the majority's holding, the record evidence here entirely fails to support a finding that licensee violated GR17a.

¶ 12. The issue at the heart of this case is whether the evidence supports the Board's finding that licensee violated GR17a, which provides: "Licensees or [their] employees shall not serve alcoholic beverages to a person whom it would be reasonable to expect would be under the influence as a result of the amount of alcohol served to that person." Department of Liquor Control General Regulation 17a, 4 Code of Vt. Rules 26 020 016-1 (2005).

¶ 13. The record evidence shows that the patron in question arrived at licensee's establishment around 8:45 p.m. and left about three hours later, between 11:45 p.m. and midnight. According to the bartender, there were about forty people in the bar that night, close to capacity. The bartender testified that he served the patron an initial drink of Southern Comfort and orange juice in a sixteen-ounce glass, and a second identical drink about an hour later. The bartender also testified that he later discovered the second drink had been only partly consumed. The bartender observed the patron during the evening moving around the establishment, talking with other patrons and dancing. The bartender testified that the patron had no difficulty ordering or moving and showed no signs of intoxication. When the patron left, the bartender noticed that he sat in his car for a couple of minutes before driving off. A part-owner of the bar who was in the establishment that night also recalled seeing the patron dancing, and observed no signs of intoxication.

¶ 14. A chemist employed by the State testified that the patron's blood alcohol concentration (BAC) at 3:30 a.m., two hours after the accident, was .155, or almost three times the legal limit. Using a relation-back formula, the chemist concluded that the patron's BAC at the time he left the bar was .211, and at the time of the accident was .202. The chemist further testified that, based solely on the alcohol content of the two drinks served by the bartender, the patron's BAC at the time of the accident would have been only .055.

¶ 15. The question for the Board thus became: what accounted for the patron's extremely high BAC? Three possibilities — alone or in combination — presented themselves. First, the bartender could have served the patron much more than he admitted. In this regard, the chemist testified that, to achieve the patron's measured BAC, he would have had to consume a total of six drinks like the ones described. Second, other persons could have purchased drinks for the patron that evening, although the bartender testified that he did not observe this occurring, and there was no other evidence to support the scenario. Third, the patron could have had an elevated BAC when he arrived at the bar. In this regard, a police videotape recorded later that evening, following the accident, reveals the patron telling the investigating officer that he had consumed eight or nine drinks in total that day, starting around 1:00 p.m. Assuming this to be the case, however, the State chemist testified that most of the alcohol consumed over the course of the day would have been eliminated before the patron arrived at the bar. Thus, the third possibility would depend on the patron having consumed much more alcohol earlier in the day than he admitted.

¶ 16. Which of these theories did the evidence support? The Board appears to have basically accepted the first, finding that "the drink count provided by the [licensee] is scientifically incompatible with the BAC values provided . . . by the relation back process, and is therefore not credible," and further finding that "[w]ith a BAC of .202 at the time of the crash, it is impossible to consider the testimony of [the bartender] about the number of drinks he claimed to have served to [the patron] that evening as credible." The Board subsequently acknowledged the possibility of the second theory, as well, stating:

> The Board concludes that materially all of the high BAC that [the patron] obtained was acquired while he was at the [licensee's] premises. This was achieved *either* by drinks having been served directly [by the bartender] *or* by drinks having indirectly been served to [the pa-

tron] by allowing other patrons to buy two drinks without determining exactly where they are going or if they knew they were going to [the patron].

(Emphasis added.) Finally, the Board also appears to have recognized the possibility of the third option, noting that although the patron drove to the bar and did not appear to be intoxicated, both the chemist and licensee's expert testified that "experienced, hard drinkers may be substantially intoxicated and yet be able to walk without giving gross signs of their condition," and that alcohol the patron had earlier consumed may have "contributed to some degree to the elevated BAC that he had at the time of the crash."

¶ 17. Two significant problems undermine the Board's findings and conclusions. First, the Board fails to explain, based on the evidence, why any one theory is more plausible than the other two. The preponderance-of-the-evidence standard applicable in Board proceedings is not particularly demanding, but it *does* require proof that the existence of the contested fact is "more probable than not." *In re N.H.*, 168 Vt. 508, 512, 724 A.2d 467, 470 (1998). Where two or more inferences from the evidence are reasonable, this requires — at a minimum — that "the inference from the facts proved must be at least the more probable hypothesis, with reference to the possibility of other hypotheses." *Jackson v. True Temper Corp.*, 151 Vt. 592, 596, 563 A.2d 621, 623 (1989) (quotation omitted). Based on the evidence here, it is just as reasonable to infer that the patron's high BAC resulted from him being well over the legal limit when he arrived at the bar and imbibing the two drinks he was admittedly served, as it is to infer that the high BAC resulted from him either being served six drinks by the bartender or obtaining additional drinks from others at the bar. Stated differently, the patron might have lied about the number of drinks he consumed that day; the bartender might have lied about the number of drinks he served the patron; or some other unknown person or persons might have purchased additional drinks for the patron. There was simply no evidence to establish one theory as more probable than the others.[3]

¶ 18. The Board appears to have resolved this evidentiary dilemma by concluding that any one of the theories would constitute a violation of the regulation in question. This is the second flaw in the Board's reasoning. As noted, GR17a provides that a licensee or its employees

---

[3] Although the record speaks for itself, I do not find that it supports the majority's assertion that the patron "denied" having consumed substantial alcohol during the day. *Ante*, ¶ 9. To conclude otherwise, the majority suggests, is to "reject the Board's findings," but the Board itself relied on the investigating officer's testimony that the patron admitted having consumed "eight or nine drinks" "over the day" and the Board expressly found, based upon its own viewing of the police videotape, that the patron "was questioned about how many drinks he had and he stated that he had some eight or nine drinks before the accident" and had "started drinking between 12:00 and 2:00 in the afternoon" with "some drinks in his car." The majority further mischaracterizes the argument here in stating that "the dissent proposes that the multiple extra drinks" which the patron may have consumed at the bar "were all supplied by the other patrons of the bar." *Ante*, ¶ 10. First, this possibility was raised by *the Board*, not the dissent, and second, the dissent does not propose that this was, in fact, what occurred. The point here is simply that there was no more evidence to support or impeach this possibility as there was to support or impeach the possibility that the patron was served extra drinks by the bartender.

"shall not serve alcoholic beverages to a person whom it would be reasonable to expect would be under the influence as a result of the amount of alcohol served to that person." The regulation was plainly designed to prohibit a licensee from serving alcohol in sufficient quantity to result in intoxication, even if the person does not appear to be intoxicated. Thus, it would apply only to the first theory — that the bartender lied and actually served the patron six large drinks — and then only if there were any evidence to support it.

¶ 19. It would just as plainly *not* apply to the second theory, however, i.e., the scenario where the licensee serves alcohol to one patron who provides it to another. The rule prohibits service "to a person" where it is reasonable to expect that intoxication would result from the alcohol being served "to *that* person." (Emphasis added.) While the Board may be correct that licensees have a "responsibility to make sure that an extra drink which may have been served to a patron [does] not fall into the hands of . . . any other patron who was a heavy drinker," that responsibility does not arise from GR17a, which simply does not by its terms apply to this situation.[4]

---

[4] In response, the majority indicates that it does not "believe" that GR17a applies only where the licensee serves the person directly, and states its "view" that it is the licensee's duty under the regulation to "monitor 'the amount of alcohol served to that person.' " *Ante*, ¶ 10. Beliefs and views are not a substitute for analysis, however, and nothing in the text of the regulation suggests that it applies in circumstances where persons other than the "licensee or his or her employee" serves alcohol to a person whom it would be reasonable to expect would be under the influence as a result of the amount of alcohol "served to that person." Regulation 17a.

¶ 20. Finally, as to the third possibility, the Board concluded that licensee had a duty, under the circumstances, to determine the patron's sobriety level immediately upon his arrival and to refuse service of even the first drink if it would result in his intoxication. The bartender testified that, about a week or two before the incident, he had refused to serve the patron in question after overhearing him admit that he had been drinking heavily that afternoon. Based on this one incident, the Board concluded that it was therefore reasonable to presume that the patron had a "propensity" to drink to excess before he arrived, and the bartender "should have assumed that [the patron] had been drinking before he arrived and likely to the same substantial extent, more or less, as he did before." Based on that one prior incident, the Board wrote that "[i]t should further be presumed in such a case that [the patron] would arrive with sufficient alcohol in him so that he may very well be over the limit when he arrived, no matter how well disguised." The Board concluded that, even if the patron did not appear to be intoxicated, closer examination would have disclosed signs of impairment, such as slurred speech, watery eyes, or degraded "fine motor skills." This responsibility apparently applies notwithstanding the Board's conclusion in this case that "there simply [wasn't] any evidence . . . indicating that [the patron] was displaying any signs of intoxication when he entered." I find the Board's presumptions irrational.

¶ 21. Although it does not admit to creating a novel duty, the Board has in effect made licensees strictly liable — or very close to it — for every patron who has ever been intoxicated in their establishment. Under the Board's reading of GR17a, it is not sufficient to shutoff a patron after serving a sufficient number of drinks to result in intoxication, as the regulation reasonably requires. Under

the Board's ruling, licensees now have a duty to closely examine every patron who enters their establishment — regardless of whether they appear to be intoxicated — if they have ever been previously intoxicated or admitted to having been so. Further, I find no evidence that Regulation 17a was designed for this purpose.

¶ 22. The rule prohibits service to a person "whom it would be *reasonable* to expect would be under the influence as a result of the amount of alcohol served to that person." (Emphasis added.) Thus, even in a crowded bar, as this one was, it is certainly reasonable to require that a licensee not serve anyone who is either visibly intoxicated or who has been served enough alcohol to be intoxicated. To require that a licensee exercise hyper vigilance for every person who has ever previously exhibited signs of intoxication or (as here) merely admitted to heavy drinking, however, strikes me as unreasonable and unenforceable. Although this Court generally employs a deferential standard to an agency's interpretation of its own regulation, we must nevertheless "endeavor to ensure that such deference does not result in 'unjust, unreasonable or absurd' consequences." *In re Verburg*, 159 Vt. 161, 165, 616 A.2d 237, 239 (1992) (quoting *O'Brien v. Island Corp.*, 157 Vt. 135, 139, 596 A.2d 1295, 1297 (1991)). That is precisely the result, in my view, of the Board's ruling here, and I would expect it to lead to even more troubling cases in the future. Therefore, I respectfully dissent.